UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Florine K. Ching as Trustee for the Heirs and Next of Kin of Travis Matthew Jordan, Decedent<br><br>**Plaintiff,**<br><br>vs.<br><br>City of Minneapolis; Ofc. Neal Walsh; and Ofc. Ryan Keyes in their individual and official capacities,<br><br>**Defendants.** | Court File No.<br><br>**COMPLAINT WITH JURY DEMAND** |

## INTRODUCTION

For her Complaint, Florine K. Ching, in her capacity as Trustee for the Heirs and Next of Kin of Travis Matthew Jordan, Decedent state and allege as follows:

1. By order dated April 21, 2020, Hennepin County District Court Judge Laurie J. Miller appointed Florine K. Ching as Trustee for the heirs and next of kin of Travis Matthew Jordan, Decedent.

2. This is an action for money damages arising out of the November 9, 2018 fatal shooting of Travis Matthew Jordan resulting from a violation of his Constitutional rights by the City of Minneapolis and on-duty Minneapolis police officers Neal Walsh and Ryan Keyes. Plaintiff asserts these officers violated Travis' well-settled federal civil rights while acting under color of state law.

3. Further, this action is for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and/or Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act and pursuant to Minnesota state law, against the City of Minneapolis and Minneapolis police officers Neal Walsh and Ryan Keyes.

1

4. Plaintiff further asserts a claim against City of Minneapolis under *Monell v. Department of Social Services*, 436 U.S. 658 (1975), and *Canton v. Harris*, 489 U.S. 378 (1989).

## JURISDICTION AND VENUE

5. This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under the Civil Rights Act of 1871, Title 42, §1983 to redress and enjoin the illegal practices alleged in this Complaint. This Court also has supplemental jurisdiction over plaintiff's state law claims pursuant to Title 28, United States Code, §1367.

6. Venue is proper in the District of Minnesota because Defendant City of Minneapolis is located in this district, the individually named defendants are employed in this district, and the incidents in question occurred in this district.

## PARTIES

7. Plaintiff's decedent, Travis Matthew Jordan ("Travis") was a resident of Minneapolis when he died as a result of homicide by Minneapolis police on November 9, 2018.

8. Plaintiff Florine K. Ching is the biological Mother of decedent Travis Matthew Jordan and has been designated as Trustee for purposes of commencing this action and was at all material times a resident of the State of Minnesota.

9. Defendant Police Officers Neal Walsh ("Walsh") and Ryan Keyes ("Keyes") were at all times relevant to this complaint duly appointed and acting officers of the police department of the City of Minneapolis, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota and/or the City of Minneapolis.

10. The City of Minneapolis ("Minneapolis" or "The City"), Minnesota, is a municipal corporation and the public employer of the Defendant Officers. Defendant Minneapolis is

sued directly and also on the theories of respondeat superior or vicarious liability and pursuant to Minn. Stat. § 466.02, for the actions of its officers and officials, including the Defendant Officers.

**FACTS**

11. On November 9, 2018, Travis was not feeling well.

12. Travis' girlfriend, Taren Vang (hereafter "Taren"), arranged to bring him food that afternoon.

13. Travis called Taren at 12:00 pm and asked her not to come over.

14. Taren became concerned about Travis' mental state. He had been previously injured in an accident and suffered from bouts of anxiety and manic depression.

15. At 1:05 pm that day. Travis sent Taren a music video about suicide. He also stated that he was "thinking of doing this at my mother's house." His mother lives in Waseca, Minnesota and lived there at the time of this incident.

16. Fearing for Travis' wellbeing, Taren called a healthcare professional she knew and asked for advice. Taren was advised to call police.

17. Taren called the 311 non-emergency telephone line.

18. Taren's call was transferred to the 911 emergency line.

19. Taren answered the questions asked by the 911 dispatcher. She provided Travis' address and explained that he was having thoughts of committing suicide at his mother's house in Waseca (about an hour and 15 minutes away). Taren made it clear that Travis did not own a vehicle or have access to transportation.

20. When asked, Taren explained that no one else was home.

21. When asked, Taren explained that several months prior, Travis talked about having someone find him a gun but that she had talked him out of it and, thus, he did not own a gun.

22. At 1:58 pm, Minneapolis 911 dispatch issued the call to police officers about a suicidal man.

23. In issuing the call, the dispatcher told police that Travis was stating that he wants to die and is going to commit suicide at his mother's house. The dispatcher never mentioned that his mother's house is 1.25 hours away and that Travis lacked transportation to get there.

24. The Computer-Aided Dispatch (CAD) log indicates that police were notified that this was an EDP (emotionally-disturbed person) call.

25. The CAD log also indicates that officers were provided with Travis' name and telephone number.

26. Dispatchers incorrectly told police that Travis was trying to buy a gun.

27. The CAD log indicates that dispatch considered this an urgent call, assigning it a priority 1 response with 2 officers, a sergeant, and an individual trained in crisis intervention.

28. Officers Keyes and Walsh in squad 410 assigned themselves to the call.

29. On arrival, Keyes and Walsh stood on the front steps, knocking and ringing the doorbell.

30. When there was no response, Keyes walked around to the side of the house, peered into a side window and shined his flashlight in.

31. Keyes tapped on the window glass with his flashlight.

32. Keyes yelled to Walsh, who was still in front of the house, "I got somebody in the window back here."

33. Keyes motioned to Travis to come outside and then came to the front of the house.

34. Travis clearly indicated that he did not wish to speak with the officers, and that he wished for them to leave.

35. Keyes and Walsh agreed that Walsh would contact their sergeant for instructions and that Keyes would wait in front of the house.

36. The sergeant told Walsh not to force entry into the house but to call Taren and see if she could get Travis to come out of the house.

37. While Walsh was on the telephone with the sergeant, Keyes did not wait in front of the house. Instead, he went back to the side of the house and into the backyard.

38. As Walsh returned to the yard in front of Travis' home, Keyes told Walsh that he saw Travis in the front porch area of the house. He observed that Travis had a knife.

39. Keyes again demanded to Travis that he "come here!" and "Come here, dude!"

40. Travis followed the officer's command by coming out the front door.

41. As Travis emerged through the front door, Keyes yelled, "He's got a knife, dude! He's got a knife!"

42. Keyes drew his gun.

43. Walsh radioed that Travis had a knife and that he was coming outside.

44. Keyes told Walsh to get his mace out.

45. Keyes also radioed that Travis was coming outside.

46. Both officers yelled commands at Travis. Walsh was yelling "do not come outside" while Keyes was yelling "drop the knife."

47. Travis walked out of the door yelling, "Let's do this."

48. Travis walked slowly toward the officers. His arms were down at his sides and he never raised the knife.

49. Walsh took several steps away from Travis and began firing.

50. Walsh fired three shots at Travis. Travis fell to the ground; the knife fell in front of him.

51. Walsh lowered his weapon and fired four more shots at Travis, who was lying in the snow unarmed.

CASE 0:21-cv-02467-KMM-DTS   Doc. 1   Filed 11/08/21   Page 6 of 10

52. Keyes, who had been holding his weapon one-handed, fired one round, and stopped. He then re-holstered his gun, put Travis in handcuffs, and began to render aid.

53. Less than one minute elapsed between Keyes' demand for Travis to come out of the house from the side yard and the shooting.

54. All seven of Walsh's shots hit Travis.

55. Travis was transported to North Memorial Hospital where he died as a result of his gunshot wounds.

56. Prior to shooting Travis, neither officer attempted any de-escalation techniques although they had received de-escalation training. In fact, they escalated the situation with their demands to come outside and conflicting orders once Travis appeared in the doorway of his home.

57. Neither officer used Travis' name, even though it was known to them. Using someone's name in a crisis situation establishes rapport and trust. The officers would have learned this technique in de-escalation training, but they failed to use it for Travis.

58. The best defense against an edged weapon is a barrier. The walls of a house are an excellent barrier. Keyes and Walsh were aware that Travis had a knife before Travis exited the front door.

59. There was a car parked behind the officers that could have provided cover but neither officer made any attempt to find cover after Travis obeyed their commands by coming out of the house.

60. Neither officer was equipped with a Taser or other electronic control device (ECD) as the City had decided not to issue them to new recruits.

61. Neither officer had beanbag rounds or a beanbag gun with them, a less-lethal projectile available to all Minneapolis police officers.

62. Despite not having less-lethal weapons, Keyes and Walsh assigned themselves to a call for a suicidal man.

63. Defendant Officers were aware that a Minneapolis Park Police Officer equipped with a Taser was coming to assist, but failed to withdraw from the call until the Park Police Officer's arrival.

64. Travis suffered pain and terror after being shot by Defendant Walsh.

65. Travis' family suffered damages as a result of his death including medical expenses, funeral expenses, loss of earnings, and loss of support.

### CLAIMS FOR RELIEF

**COUNT 1: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT EXCESSIVE FORCE AGAINST DEFENDANT KEYES AND WALSH**

66. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

67. Defendants Keyes and Walsh precipitated the shooting encounter with Travis by ordering him to come out and speak with them after he had clearly indicated that he wished for them to leave.

68. Defendants Keyes and Walsh precipitated the shooting encounter when they failed to use distance and barriers to control the situation.

69. Defendants Keyes and Walsh precipitated the shooting situation when they failed to use the nonlethal weapons at their command.

70. Travis was not a credible threat to Officer Walsh when Walsh and Keyes fired their weapons, because the Defendant Officers knew that Travis was a suicide risk, and that he walked steadily towards Walsh without raising his knife.

71. Travis was not a threat to Defendant Walsh after Walsh fired his first three shots and Travis fell to the ground dropping his knife.

72. Despite precipitating the situation, and in spite of the lack of a credible threat to their safety, Walsh and Keyes fired their weapons, resulting in the death of Travis Jordan.

73. Walsh's and Keyes' use of force was excessive and violated Travis' right to be free from unreasonable seizure in violation of the Fourth Amendment to the Constitution.

74. Defendants Walsh and Keyes were uniformed officers of the Minneapolis Police Department operating under color of law at the time of the shooting.

75. Plaintiff has suffered pecuniary loss as a result of his death.

### COUNT 2: CIVIL ASSAULT, BATTERY AND WRONGFUL DEATH AGAINST DEFENDANT KEYES AND WALSH

76. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

77. The conduct described above establishes that Defendants Walsh and Keyes intentionally acted to inflict harm upon Travis, that they had the apparent ability to inflict harm, and that Travis had a reasonable apprehension of bodily harm.

78. The conduct described above establishes that Defendant Walsh intentionally applied harmful force to Travis without his consent causing the harm described above.

79. By reason of Defendant Walsh's unlawful conduct described above, Travis lost his life.

80. Plaintiff is entitled to recover all damages suffered as a result of Travis' assault, battery, and wrongful death.

### COUNT 3: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE MINNESOTA HUMAN RIGHTS ACT AGAINST ALL DEFENDANTS

81. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

82. Travis had a previous mental disability.

83. Travis was suffering from a disability of depression with suicidal ideation at the time Defendants Walsh and Keyes came to his home.

84. Defendants Walsh and Keyes were aware of Travis' disability through dispatch.

85. Travis was entitled to reasonable policing services as any non-disabled member of Minneapolis.

86. Travis was entitled to reasonable accommodation of his disability as necessary.

87. Travis was excluded from reasonable policing service when Defendants Walsh and Keyes failed to make accommodation for his disability.

88. Defendants' exclusion of Travis from reasonable policing services violated both the Americans with Disabilities Act 42 U.S.C. §12101 et. Seq. as well as the Minnesota Human Rights Act, Minn. Stat 363A.12

89. As a result of Travis' exclusion from reasonable policing services, including failure to accommodate his disability, Plaintiff has suffered damages as aforesaid.

**COUNT 4: 42 U.S.C. §1983–MONELL LIABILITY AGAINST THE CITY OF MINNEAPOLIS**

90. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

91. The Minneapolis City Charter establishes the Minneapolis Police Department and provides that the Mayor oversees the functions of the department. The Police Chief is appointed by the Mayor and approved by the City Council and is the head of the Minneapolis Police Department.

92. The Mayor, the City Council, and the Police Chief have final policymaking authority with regard to establishing written policies and budgets governing the equipping of MPD officers performing policing functions on behalf of the City.

93. The written policies and budgets established and/or approved by The Mayor, the City Council, and the Police Chief constitute the official policy of the City and were the moving force behind and caused Plaintiffs' injuries.

94. The violation of Travis' Fourth Amendment rights was a direct and inevitable result of the policies and budgets established by the Defendant City.

95. The City of Minneapolis acting through its Chief of Police, Mayor, and City Council failed to equip Defendants Walsh and Keyes with less-lethal ECDs that could have prevented the death of Travis Jordan.

96. The death of Travis Jordan or like-situated citizens was the inevitable result of Defendant City's failure to issue ECDs to its officers.

97. As a result of this Constitutional violation, Plaintiff has suffered damages as aforesaid.

## RELIEF REQUESTED

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

a. Issue an order granting Plaintiff's judgment against Defendants, finding that Defendants violated Plaintiff's federally protected Constitutional and statutory rights as well as Plaintiff's common law rights under Minnesota state law;

b. Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

c. Award of punitive damages to Plaintiff, pursuant to *Smith v. Wade*, 461 U.S. 30 (1983);

d. Award of such other and further relief as this Court may deem appropriate.

**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

Date: November 8, 2021         By  /s/ Paul J. Bosman
                                     Paul J. Bosman, #0388865
                                     2136 Ford Parkway, #5328
                                     Saint Paul, MN 55116-1863
                                     paul.bosman@gmail.com
                                     Tel: (651) 485-7046