## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Florine K. Ching,                                    Case No. 0:21-cv-2467 (KMM/DTS)

        Plaintiff,

v.
                                                                    **ORDER**
City of Minneapolis et al.,

        Defendants.

This case arises out of Minneapolis police officers fatally shooting Travis Jordan outside his mother's home. Mr. Jordan's mother, Florine Ching, brought this three-count action against the City of Minneapolis ("the City"); Minneapolis Police Chief Medaria Arradondo; and Minneapolis Police Officers Neal Walsh and Ryan Keyes (the "Officers")—the two officers at the scene at the time of the shooting. The Amended Complaint raises claims of excessive force in violation of Mr. Jordan's Fourth Amendment rights, state tort law, and claims for municipal liability against Chief Arradondo and the City.[1] [ECF No. 4]. The Defendants answered the Amended Complaint, stipulated to stay discovery, and now move for judgment on the pleadings pursuant to Rule 12(c). [ECF Nos. 13 & 32]. Defendants argue that the officers are entitled to qualified and official immunity, and that there is no underlying

---

[1] While the Amended Complaint lists other claims, Ms. Ching no longer pursues those not listed herein.

1

constitutional violation, and therefore no claim, against the City or Chief Arradondo. The Court heard oral argument on Defendants' Motion on March 9, 2022. [ECF No. 42]. For the reasons that follow, the Court grants in part and denies in part Defendants' Motions.

## I.  Background[2]

On November 9, 2018, Mr. Jordan's girlfriend, Taren Vang, called a non-emergency police line because she was concerned about Mr. Jordan's mental state and wellbeing. [Am. Compl., ECF No. 4 at ¶¶ 12–17]. She was subsequently transferred to 911. [*Id.* at ¶¶ 19]. Ms. Vang informed the 911 operator that Mr. Jordan was having suicidal thoughts at his mother's house in Waseca, Minnesota, and that no one else was with him. [*Id.* at ¶ 20]. When asked, she informed the 911 operator that "several months prior, [Mr. Jordan] talked about having someone find him a gun, but that she had talked him out of it" and that he therefore did not own a gun. [*Id.* at ¶ 22].

The 911 operator issued a call to officers for a suicidal emotionally disturbed person, providing Mr. Jordan's name and address. [*Id.* at ¶¶ 23–26]. The operator also "incorrectly told police that [Mr. Jordan] was trying to buy a gun." [*Id.* at ¶ 27]. Officers

---

[2] The facts in this section are taken from the allegations in the Complaint. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986) ("In judging the propriety of the dismissal of a section 1983 claim . . . [w]e must take the well-pleaded allegations of the complaint as true."); *Residential Funding Co. v. Wallick & Volk, Inc.*, No. 13-cv-2512 (MJD/JJG), 2014 WL 3955257, at *3 (D. Minn. Aug. 12, 2014) (noting that the motion-to-dismiss standard renders it inappropriate for the court to find facts).

Walsh and Keyes, who were not equipped with an electronic-control device or "beanbag gun,' communicated that they were responding to the call. [*Id.* at ¶¶ 29, 61–62]. After the Officers arrived at Mr. Jordan's mother's house, and after several attempts to make contact with him, Mr. Jordan told the officers that he did not want to speak and that he wanted them to leave. [*Id.* at ¶¶ 30–35]. While Officer Walsh sought instructions from his supervisor, Officer Keyes, standing at the side of the house, observed Mr. Jordan enter the enclosed front porch area and move toward the outside door while holding a knife. [*Id.* at ¶¶ 36–39]. Officer Keyes told Officer Walsh to "get his mace out" and that "he's got a knife, dude." [*Id.* at ¶¶ 42-46].

Mr. Jordan opened the outside door and stood in the doorway, repeatedly shouting "lets do this" and "come on, just do it." [*Id.* at ¶ 58]. The Officers several times ordered Mr. Jordan to drop the knife and to not come outside. [*Id.* at ¶ 47]. After a time, Mr. Jordan came out and walked slowly toward Officer Walsh with his arms at his side, but he "never raised the knife." [*Id.* at ¶¶ 48–49]. Both Officers had their firearms drawn and aimed at Mr. Jordan. [*Id.* at ¶ 43]. Officer Walsh took several steps backwards as Mr. Jordan continued approaching before firing his gun. He then "fired three shots at [Mr. Jordan, who] . . . fell to the ground; the knife fell in front of him." [*Id.* at ¶ 51]. He then "lowered his weapon and fired four more shots at [Mr. Jordan], who was lying in the snow unarmed." [*Id.* at ¶ 52]. Some time after Officer Walsh fired his first shot, Officer Keyes fired a single round. [*Id.* at ¶ 53]. All seven of Officer Walsh's shots hit

Mr. Jordan. [*Id.* at ¶ 55]. Mr. Jordan was transported to a hospital, where he was eventually pronounced dead. [*Id.* at ¶ 56].

Ms. Ching, as trustee for the heirs of Mr. Jordan, brought this action pursuant to § 1983 and Minnesota state tort law, alleging that the Officers violated Mr. Jordan's Fourth and Fourteenth Amendment right to be free from unreasonable seizure and common-law assault, battery, and wrongful death. Defendants answered and filed the instant Motion for Judgment on the Pleadings.

## II. Analysis

### A. Standard

A motion for judgment on the pleadings pursuant to Rule 12(c) is reviewed under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The distinction between a Rule 12(c) motion and a 12(b)(6) motion is "purely formal." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual allegations to state a claim to relief that is plausible on its face." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quotation omitted). The facts alleged in the complaint must "rise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action

will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at

557). When considering a motion to dismiss, the court takes all factual allegations in the

complaint as true and construes all reasonable inferences therefrom in favor of the

plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). However, the court does not

take as true wholly conclusory allegations or the legal arguments offered by the

plaintiff. *Id.*; *Westcott*, 901 F.2d 1486 (8th Cir. 1990).

### B.  Record Before the Court

In their memoranda in support of their motions to dismiss, Defendants refer to

exhibits the City filed with its Answer. Specifically, they refer to videos from Officer

Walsh and Officer Keyes' body-worn cameras (the "BWC videos") [Exs. A–B, ECF Nos.

7–8] and a report from the Minnesota Bureau of Criminal Apprehension's analysis of

those videos (the "BCA report") [Ex. C, ECF No. 9]. Ms. Ching argues that Defendants'

reference to these outside materials is improper on a Rule 12(c) motion and urges the

Court to not consider them.

"When considering a motion for judgment on the pleadings (or a motion to

dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials

outside of the pleadings . . . ." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th

Cir. 1999). Because such a motion "will succeed or fail based upon the allegations

contained in the face of the complaint," consideration of materials outside of the

complaint converts the motion to one for summary judgment. *BJC Health System v.*

*Columbia Cas. Co.*, 348 F.3d 685, 687–88 (8th Cir. 2003) ("Rule 12(b) is not permissive."). However, the court may consider materials that (1) are "part of the public record," (2) "do not contradict the complaint," or (3) are "necessarily embraced by the pleadings." *Porous Media Corp.*, 186 F.3d at 1079 (quotations omitted) (citing *Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999); and *Piper Jaffray Cos. v. National Union Fire Ins. Co.*, 967 F. Supp. 1148 1152 (D. Minn. 1997)). Consideration of these narrow categories of materials does not operate to convert the motion to one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

The Court begins with the BWC videos. Where their authenticity and completeness is not in dispute, courts from this district routinely hold that such videos are "embraced by the pleadings" and proper to consider on a motion to dismiss—as has the Eighth Circuit. *E.g.*, *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021); *Anderson v. St. Luke's Hospital*, No. 19-cv-106 (MJD/LIB), 2019 WL 7882118, at *3 n.5 (D. Minn. Nov. 19, 2019); *Verino v. Higgins*, No. 19-cv-3024 (DWF/LIB), 2020 WL 3542757, at *1 n.1 (D. Minn. June 30, 2020). However, "although the Court need not accept Plaintiff's version of events to the extent it is blatantly contradicted by video evidence, inconclusive video evidence must still be construed in Plaintiff's favor." *Kong ex rel. Kong v. City of Burnsville*, No. 16-cv-3634 (SRN/HB), 2018 WL 6591229, at *1 (D. Minn. Dec. 14, 2018), (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007); and *Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1074–75 (8th Cir. 2018)); *rev'd on other grounds*, 960 F.3d 985 (8th Cir. 2020).

Here, Ms. Ching does not dispute the BWC videos' authenticity, nor their completeness. Therefore, the Court will consider them.

The Court reaches the opposite conclusion about the BCA report. The Court need not determine whether it is "necessarily embraced by the pleadings," because even if it was, the Court may not consider it for the truth of the matters asserted. *LeMay*, 18 F.4th at 289. In *LeMay*, the Eighth Circuit declined to consider a police report of the incident at issue at the motion-to-dismiss stage because the defendant "does not simply want us to consider the police report's existence. He also wants us to accept its narrative as truth." *Id.* That is precisely what Defendants seek to do here. The report consists of a short narrative of the event, followed by a law enforcement analysis of the BWC videos and software-generated estimates of the distances between each officer and Mr. Jordan at several points in time. [ECF No. 9]. Defendants cite to this exhibit numerous times in their brief to support factual assertions regarding the threat Mr. Jordan posed. The Court simply cannot consider the BCA report in deciding the instant motion.

### C.  Excessive Force

When faced with a Fourth Amendment excessive force claim, courts assess "whether the amount of force used was objectively reasonable under the particular circumstances." *Thompson v. Monticello*, 894 F.3d 993, 998 (8th Cir. 2018) (quoting *Coker v. Arkansas State Police*, 734 F.3d 838, 842 (8th Cir. 2013)). Courts "evaluate the reasonableness of an officer's use of force from the perspective of a reasonable officer on

the scene, rather than with the 20/20 vision of hindsight." *Masters v. City of Independence*, 998 F.3d 827, 835 (8th Cir. 2021) (quotations omitted). This test "requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Seizure by deadly force is "unmatched" in intrusiveness, and "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). The government's interest in the use of force is assessed under the totality of the circumstances, but especially: "(1) the severity of the crime at issue, (2) the immediate threat the suspect poses to the safety of the officer or others, and (3) whether the suspect is actively resisting or attempting to evade arrest by flight." *Masters*, 998 F.3d at 835.

"[A]n officer does not possess the unfettered authority to shoot someone because that person is carrying a weapon but is only entitled to do so when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020)(quoting *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013)). But an officer does not violate the Fourth Amendment by using deadly force on a person with a bladed weapon "if they reasonably believed the person could kill or seriously injure others." *Kong ex rel. Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020). Here, Officers Keyes and Walsh argue that their use of

8

force was reasonable because they reasonably believed that Mr. Jordan could have killed or seriously injured them with the knife he wielded.

**Officer Walsh**

Taking the factual allegations as true and all reasonable inferences in Ms. Ching's favor, the Court concludes that the Complaint plausibly alleges that Officer Walsh acted objectively unreasonably under the Fourth Amendment. A careful examination of the three factors described above supports this conclusion.

First, Mr. Jordan had not committed, nor was he suspected of committing, any crime when the Officers showed up. The Complaint alleges that 911 dispatch informed the Officers that Mr. Jordan "wants to die" and was "going to commit suicide," and that the Officers were notified that the call was for an "emotionally-disturbed person." [ECF No. 4 at ¶ 24–25]. There is no suggestion that he had committed or was planning to commit a crime before the arrival of law enforcement. Where "the person seized is not a suspect, has committed no crime when the police approach, and is provoked by police escalation of the situation, the importance of the governmental interests alleged to justify the intrusion is necessarily diminished." *Ludwig*, 54 F.3d at 471 (quotation omitted) (concluding that whether the decedent was emotionally disturbed is "material to the reasonableness of the officers' actions").

Second, and more importantly, the allegations in the Complaint—taken as true and in the light most favorable to Ms. Ching—plausibly establish that a reasonable

officer would not have had cause to believe that Mr. Jordan posed an immediate threat to his safety. Ms. Ching argues that the reasonableness analysis should be bifurcated between the two instances of use of force alleged in the Complaint: first, Officer Walsh's initial use of force; and second, his continued use of force after Mr. Jordan had "dropped the knife and fallen to the ground." [Pltf. Mem., ECF No. 38 at 10]. The Court agrees. *See Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127, 1133 (8th Cir. 2020) (favorably discussing a prior decision in which the issue was not with the initial use of deadly force but rather with the fact that the officer continued to fire shots at the suspect)(citing *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013)). Whether Officer Walsh had probable cause to believe that Mr. Jordan posed an immediate threat at the start of the shooting, based on the allegations in the Complaint, is a close question. The question is less close, however, as to his use of deadly force after Mr. Jordan fell and dropped the knife.

Regarding Officer Walsh's continued shooting, "deadly force that is reasonable while the suspect poses a threat is no longer reasonable once the threat is no longer present." *Cole ex rel. Richards*, 959 F.3d at 1133 (quotation omitted). The Complaint alleges that Mr. Jordan "fell to the ground" and dropped the knife after Officer Walsh's first three shots. [ECF No. 4 at ¶ 51]. He then "lowered his weapon and fired four more shots." [*Id.* at ¶ 52]. The version of events is also corroborated by the BWC videos. While the videos show that the time between the first and the seventh shot was no more

than a few seconds, "mere seconds after an immediate threat has passed is sufficient time for an officer to conclude the immediate threat has passed, extinguishing any prior justification for the use of deadly force." *Id.* at 1135. Moreover, according to the Complaint, Officer Walsh had sufficient time and situational awareness to adjust his aim downward after Mr. Jordan fell to the ground; if he had the time to process that change in circumstance, a jury could also find that he had time to reassess the threat posed by Mr. Jordan and stop shooting. It is unclear from the BWC video exactly how close Mr. Jordan was to Officer Walsh when he fell, but it was certainly well out of arm's reach and the knife had fallen from his hand. [Ex. B, ECF No. 8 at 8:50]. Given these facts as alleged in the Complaint, the Court cannot say as a matter of law that a reasonable officer could not have ascertained that any threat Mr. Jordan posed to Officer Walsh ceased to be immediate after he fell to the ground and dropped the knife. Accordingly, the Court cannot conclude, based just on the Complaint read in the light most favorable to the plaintiff and the BWC videos, that it was objectively reasonable under the Fourth Amendment for Officer Walsh to shoot Mr. Jordan after he had fallen.

The Court now turns to the more difficult question, the reasonableness of the initial use of force. According to the Complaint, the "facts known to [Officer Walsh] at the precise moment" of seizure were that Mr. Jordan was armed with a knife, that he expressed suicidal intent, and that he was not suspected of any crime. *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995). The Complaint alleges that "walked slowly toward the

officers. His arms were down at his sides and he never raised the knife. Walsh took several steps away from [Mr. Jordan] and began firing." [ECF No. 4 at ¶¶ 49–50]. This description is not plainly contradicted by the BWC video.[3] The BWC videos show that Mr. Jordan was even further from Officer Walsh when he was first shot than after he fell to the ground—again well out of striking distance.

There is no shortage of caselaw finding that a person armed with a bladed weapon can pose a sufficient risk to justify officers using deadly force. The Officers cite to three such cases, but only one of these—*Estate of Morgan v. Cook*—is usefully similar on factual grounds.[4] Crucially, all three of the Officers' cases, including *Estate of Morgan*

---

[3] Defendants assert that Mr. Jordan "pump[ed] his fist that was holding the knife . . . stepped outside, swung his harm holding the knife up and out, and advanced quickly down the steps and towards Officer Walsh." [Def. Mem., ECF No. 34 at 2]. However, the point at which a normal arm movement becomes a "swing," or at which a "slow walk" becomes a "quick advance," is subjective and arbitrary. It is sufficient, at this stage, to observe that the allegations in the Complaint cannot be said to depart so substantially from what the BWC video depicts as to negate the favorable lens through which the Court views those allegations. And the Court's own review of the video does not support the aggressive picture painted by the defendants' word choice ("pump," "swung," and "quickly"), even if a more accurate description is to an extent a matter of linguistic debate.

[4] The other cases cited by the Officers are *Schneider v. City of Minneapolis*, No. 03-cv-3510 (JMR/FLN), 2006 WL 1851128 (D. Minn. June 30, 2006), in which officers fatally shot a "highly disturbed" woman who previously attempted to attack the officers with a knife and had advanced to within four to five feet of the officers with the knife held at waist level; and *Hayek v. City of St. Paul*, 488 F.3d 1049 (8th Cir. 2007), which concerned officers shooting a man who had already slashed another officer with a samurai sword and was preparing to stab him again as he lay on the ground.

*v. Cook*, were decided on summary judgment, where the standard is more rigorous than the "liberal pleading standard of plausibility" applicable here. *Baude*, 23 F.4th at 1075.

In *Estate of Morgan v. Cook*, the officer was responding to a domestic disturbance. 686 F.3d 494, 495 (8th Cir. 2012). The suspect was six to twelve feet away from the officer when his girlfriend told the officer he was concealing a kitchen knife. *Id.* at 495–96. The suspect stood up from his chair and started to move in the officer's direction when the officer shot him one time. *Id.* at 495, 498. Here, the Complaint does not allege how much distance was between Mr. Jordan and Officer Walsh when he first fired, but the BWC video does not contradict an inference that it was more than six to twelve feet. Additionally, the plaintiff suggests, that because the Officers knew Mr. Jordan was suicidal, they needed more to have probable cause to believe that he posed an immediate threat. Discovery may reveal evidence that a reasonable officer would perceive as less of a threat a person known to be suicidal, repeatedly tempting the officer to "just do it," and clearly displaying a knife; compared to a person who attempts to conceal a knife and whose intentions are not known.[5]

---

[5] The Officers cite *Schneider v. City of Minneapolis* for the proposition that "knowledge of a person's disability simply cannot foreclose officers from protecting themselves when faced with threatening conduct." No. 03-cv-3510 (JMR/FLN), 2006 WL 1851128, at *7 (D. Minn. June 30, 2006) (quoting *Bates v. Chesterfield County*, 216 F.3d 367, 372 (4th Cir. 2000)). However, while "mental illness or intoxication does not reduce the immediate and significant threat a suspect poses," Ms. Ching asserts that the threat Mr. Jordan posed was reduced by the fact that officers knew his *intention* was to commit suicide, not simply that he had a mental illness that exacerbated a delicate situation. *Kong ex rel. Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020). To the Court's awareness, the

While the question is a close one, taking the allegations in the light most favorable to Ms. Ching, the Court concludes it would be reasonable to infer that Mr. Jordan did not pose an immediate and substantial threat justifying Officer Walsh's initial use of deadly force. *Masters*, 998 F.3d at 835. Given the early procedural posture of this case, the Court must make that inference.

**Officer Keyes**

The foregoing analysis cannot apply to Officer Keyes. While the Complaint alleges that Officer Keyes fired his gun once, it does not allege that the bullet from that shot made contact with Mr. Jordan's body. Moreover, the context of the other allegations and arguments in the Complaint, which the Court must take as true, all but precludes an inference that Officer Keyes' bullet hit Mr. Jordan. *Branded v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (noting that on a motion to dismiss, "the complaint should be read as a whole").

---

Eighth Circuit has not held that an officer's knowledge that a knife-wielding individual's intent is to harm himself or to provoke officers to shoot him, cannot as a matter of law reduce the threat a reasonable officer perceives. *Loch v. City of Litchfield*, 837 F. Supp. 2d 1032, 1040 (D. Minn. 2011), *aff'd*, 689 F.3d 961 (8th Cir. 2012) (concluding that the suspect's intent to commit "suicide by cop" was immaterial because the officers were unaware of such an intent). However, other courts have addressed this issue. *E.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) (concluding that the suspects "invit[ing] officers to use deadly force on him" creates a fact-issue as to whether the government's interest in using deadly force was diminished"); *Shirar v. Guerrero*, 673 F. App'x 673, 675 (9th Cir. 2016) (same). Therefore, the Court will consider the allegation that Officer Walsh knew Mr. Jordan intended to commit suicide in the light most favorable to Ms. Ching.

That "a plaintiff, at the pleading stage, must allege facts supporting each element of a claim . . . is indeed the law in the Eighth Circuit." *Am. Inst. of Physics v. Schwegman Lundberg & Woessner, P.A.*, No. 12-cv-528 (RHK/JJK), 2012 WL 3799647, at *2 n.1 (D. Minn. July 2, 2012) (citing *Brown v. Simmons*, 478 F.3d 922, 923 (8th Cir. 2007)). A necessary element of any excessive force claim is that the defendant officer affected a seizure. *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) ("To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable."). However, nowhere in the Complaint does she allege that Officer Keyes seized Mr. Jordan. *See Williams v. City of Burlington*, 516 F. Supp. 3d 851, 864 (D. Iowa, 2021) (holding that a seizure does not occur when an officer shoots at but misses a suspect, and that "anything other than a seizure, such as an attempted seizure, falls outside the purview of the Fourth Amendment and is not actionable under § 1983").

Admittedly, even under *Brown v. Simmons*, a plaintiff need not "*expressly* plead facts to support the elements of a claim in the complaint. Rather, a plaintiff may rely upon plausible *inferences* from the well-pleaded facts to state a claim for relief." *Am. Inst. of Physics*, 2012 WL 3799647, at *2. In her memorandum, Ms. Ching argues that while it is "unclear . . . whether or not Officer Keyes' bullet caused [Mr. Jordan's] suffering and death," the Complaint nevertheless states a plausible claim against Officer Keyes because it alleges that "the *officers* fired their weapons, resulting in the death of Travis"

15

and that "the *officers'* use of force was excessive." [Pltf. Mem, ECF No. 38 at 9 (emphasis added)]. However, with this argument, Ms. Ching is not stating that the Court should "draw the reasonable inference that the defendant is liable for the misconduct alleged," but should draw the inference that certain misconduct was alleged in the first place when it was not. *Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010).

Ms. Ching also points to a paragraph in count one of the Complaint, which asserts that "Walsh and Keyes fired their weapons, resulting in the death of Travis Jordan." However, the Complaint alleges that "[a]ll seven of Walsh's shots hit Travis" and that "Travis suffered pain and terror after being shot by Defendant Walsh." [ECF No 4 at ¶¶ 55, 65]. In the context of such specific allegations as to Officer Walsh, the omission of any corresponding allegations pertaining to Officer Keyes is noteworthy.

Finally, the caselaw Ms. Ching cites is inapposite. In *Hyung Seok Koh v. Graf*, the Illinois district court declined to dismiss a complaint which alleged that "Defendant Officers" engaged in the alleged wrongful conduct, noting that "Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer" No. 11-CV-02605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013). However, in addition to allegations elsewhere in that complaint attributing specific actions to specific officers, the complaint alleged that *all* the defendant officers had engaged in conduct for which the plaintiff had a plausible claim—the court merely held that the plaintiff need not

allege specifically which officer engaged in which conduct. Here, the Complaint does not allege that Officer Keyes engaged in conduct that gives rise to a plausible Fourth Amendment claim, because it does not allege that he seized Mr. Jordan by hitting him with a bullet. Accordingly, the Motion for Judgment on the Pleadings is granted as to the § 1983 claim against Officer Keyes.[6]

### D.  Qualified Immunity

Officer Walsh alternatively argues that, even if his conduct violated the Fourth Amendment, his motion should be granted because he is entitled to qualified immunity. The defense of qualified immunity "protects public officials from § 1983 damage actions if their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005). To succeed on a motion to dismiss a § 1983 claim on qualified immunity grounds, the defendant must show that he is "entitled to qualified immunity on the face of the complaint." *Stanley v. Finnegan*, 899 F.3d 623 (8th Cir. 2018). The Court has already concluded that the Complaint states a plausible claim for violation of Mr. Jordan's Fourth Amendment rights. Accordingly, whether Officer Walsh is entitled to qualified immunity turns on whether the right to be free from the

---

[6] If in the course of discovery Ms. Ching learns of evidence that Officer Keyes' shot did hit Mr. Jordan, she may at that time move to amend the Complaint's allegations accordingly and re-name Officer Keyes as a defendant.

actions taken here was clearly established such that a reasonable officer would have known that Officer Walsh's conduct was unlawful.

"For a right to be 'clearly established,' the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020) (quotation omitted). There must be "existing precedent" on "sufficiently similar facts" that puts "the question beyond debate." *Id.* (quotation omitted). However, "the critical question is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate the individual's right not to be seized" by such force. *Id.* (quotations omitted). The prior caselaw must be from the local circuit "or, in the absence of binding precedent, a robust consensus of cases of persuasive authority constituting settled law." *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021).

The Court concludes that it was not clearly established that it was unlawful for Officer Walsh to initially use deadly force against Mr. Jordan. However, it was clearly established that after Mr. Jordan had fallen to the ground and dropped the knife, it was unlawful to continue shooting.

Admittedly, as already explored, there is plenty of caselaw from this circuit addressing the propriety of officers' use of force on individuals armed with bladed

weapons. However, none of those decisions involve "sufficiently similar facts" to those alleged here to put the illegality of Officer Walsh's initial use of deadly force "beyond debate." *Id.* Ms. Ching cites to *Maras v. City of Brainerd*, where the Minnesota Court of Appeals held that an officer violated a clearly established right when he shot someone who was holding a knife and moved towards the officer slowly until he was between five and fourteen feet away. 502 N.W.2d 69, 73 (Minn. Ct. App. 1993). Not only did the court note that the suspect "never raised the knife above his waist," but the court also observed that none of the police officers felt that the man posed any danger to his nearby wife with whom he was arguing and that he "was obviously intoxicated and could barely stand." *Id.* at 73, 77. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Accordingly, the Court concludes that Officer Walsh is entitled to qualified immunity as to his initial use of force.

In contrast, with respect to Officer Walsh's continued use of deadly force after Mr. Jordan had fallen and dropped the knife, the Court concludes that there is sufficient precedent to put a reasonable officer on notice that, as alleged in the Complaint, Officer Walsh's conduct was unlawful. In *Cole ex rel. Richards*, the Eighth Circuit held that it was clearly established before October 2016 that "a few seconds is enough time to

determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force." 959 F.3d at 1134. In that case, "[r]oughly five seconds" had elapsed between the asserted justification for deadly force had ended and the officer firing. *Id.* The court cited *Ludwig*, wherein "a few seconds" was found to be sufficient time to conclude that a situation warranting deadly force has ceased. *Id.* Accordingly, as to his use of force after the threat had allegedly ended, the Court concludes that Officer Walsh has not shown he is entitled to qualified immunity on the face of the Complaint and denies his motion.[7]

### E.  Assault and Battery

Ms. Ching claims that the Officers' actions constitute assault under Minnesota state common law. She also claims that Officer Walsh's shooting of Mr. Jordan constitutes battery and wrongful death under Minnesota state common law. The Officers argue only that they are entitled to official immunity on these state-law tort claims.[8]

---

[7] The *Cole ex rel. Richards* court emphasized, as does the Court here, the "limited nature" of its ruling. 959 F.3d at 1136. The Court does not hereby conclude that Officer Walsh has "in fact violated [Mr. Jordan's] rights"—only that the Complaint, which the Court must accept as true and construe in Ms. Ching's favor, states a plausible claim for relief. *Id.*

[8] Therefore, absent a finding of official immunity, the Officers have waived any argument that the Complaint otherwise fails to adequately state these claims.

In Minnesota, "[a] law enforcement officer's decision to use deadly force is a discretionary decision for which official immunity applies absent a showing of a willful or malicious wrong." *Birkeland*, 971 F.3d at 792 (citing *Elwood v. City of Rice*, 423 N.W.2d 671, 677 (Minn. 1988). An officer acts with malice under Minnesota law if he "had reason to believe [his conduct] is prohibited." *Id.* (citing *State ex rel. Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994)).

As articulated above, the Complaint plausibly alleges that a reasonable officer in Officer Walsh's position would know that his conduct was unlawful. Accordingly, Officer Walsh is not entitled to official immunity on the state law claims. With respect to Officer Keyes, again as noted above, the Complaint does not plausibly allege that he shot Mr. Jordan. Therefore, requisite elements of the battery and wrongful death claims have not been plausibly alleged, and the issue of official immunity is moot. *See Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990) (noting that battery requires "contact with another person").

As for the assault claim, in Minnesota, "assault is an unlawful threat to do bodily harm to another with present ability to carry the threat into effect." *Dahlin v. Fraser*, 206 Minn. 476, 478, 288 N.W. 851, 852 (1939). Critically, the threat must cause the assaultee "reasonable apprehension of immediate bodily harm." *Id.* The Complaint asserts that Mr. Jordan "had a reasonable apprehension of bodily harm." However, not only is this a conclusory assertion unsubstantiated by any factual allegations, but it directly

contradicts the assertion that Mr. Jordan wanted to prompt the Officers to shoot him, as well as his repeated shouting "lets do this" and "just do it."[9] Accordingly, the issue of whether Officer Keyes is entitled to official immunity on the assault claim is immaterial, as the Complaint does not plausibly allege that he committed an assault in the first place.

### F.  *Monell* **Claims**

Finally, the Ms. Ching brings a § 1983 claim against the City and Chief Arradondo pursuant to *Monell v. Department of Social Services*.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Therefore, when courts evaluate a § 1983 claim against a municipality, they must apply "rigorous standards of culpability and causation . . . to ensure that the municipality is not held liable solely for the actions of its employees." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 676

---

[9] Further, even if Ms. Ching were to successfully argue that these allegations do not preclude a finding that Mr. Jordan had an apprehension of bodily harm, the BWC videos show that once Mr. Jordan left the house, his attention was exclusively on Officer Walsh, who also had his firearm pointed at Mr. Jordan.

(2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").

A municipality may be liable under § 1983 where "the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted). Ms. Ching's claim is premised on the official-policy theory. Specifically, she points to (1) the policies and budgets which resulted in the Officers not being equipped with less-lethal electronic-control devices, and (2) the policies requiring 911 dispatch operators to ask certain kinds of questions and relay certain information to police officers.

With respect to the first policy, Ms. Ching argues that, had the Officers been equipped with means of applying less lethal force, Mr. Jordan's rights would not have been violated. However, "[t]here is . . . not a single precedent which holds that a governmental unit has a constitutional duty to supply particular forms of equipment to police officers." *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994); *Davis v. City of Tulsa*, 380 F. Supp. 3d 1163, 1175 (N.D. Ok. 2019) (collecting appellate cases). *But see Carswell v. Borough of Homestead*, 381 F.3d 235, 259 (3d Cir. 2004) (McKee J., dissenting) ("I am also far less impressed with the analysis of the Court of Appeals for the Seventh Circuit in *Plakas v. Drinski* . . . than my colleagues. . . . [D]efining our inquiry in terms of whether the Constitution creates an approved "equipment list" for police is both misleading and

counterproductive."); *Brown*, 520 U.S. at 409 ("[I]n *Canton* . . . we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.").

While the Court is not adopting the reasoning of the Seventh Circuit in *Plakas v. Drinski*, it does conclude that this case does not fall into the hypothetical "narrow range of circumstances" upon which a *Monell* claim may be premised on a failure-to-equip theory. *Brown*, 520 U.S. at 409. The Complaint alleges that "Keyes told Walsh to get his mace out," but it does not plausibly allege how it is "highly predictable" that equipping officers with a chemical irritant but not an electronic control device would lead to recurring constitutional violations. *See generally Carswell*, 381 F.3d at 259 (McKee J., dissenting) ("Given the duties of a police officer, it was certainly foreseeable that the Borough's policy of equipping officers *only with guns* and training them *only in the use of deadly force* would sooner or later result in the use of unjustifiable deadly force." (emphasis added)). Neither does the Complaint allege, much less to a "rigorous standard[] of culpability and causation," that this policy has resulted in other violations of constitutional rights. *Brown*, 520 U.S. at 409.

With respect to the second policy underlying Ms. Ching's *Monell* claim—that which allegedly requires 911 dispatchers to solicit and transmit certain kinds of information—the Court likewise concludes that the Complaint does not plausibly allege

that any such policy contributed to the deprivation of Mr. Jordan's rights. Ms. Ching

asserts that this policy led to the 911 dispatcher relaying information which "prepared

[the Officers] for a violent encounter with an armed man, rather than for an appropriate

response to a possibly suicidal person." [ECF No. 4 at ¶ 101]. However, the Complaint

alleges that the dispatcher did inform the Officers that Mr. Jordan "want[ed] to die and

is going to commit suicide at his mother's house," and the only allegation that could

have prepared the Officers "for a violent" encounter is that the dispatcher "incorrectly

told police that Travis was trying to buy a gun." [ECF No. 4 at ¶ 27]. Even assuming

that caused Officer Walsh to use unjustified force, this would have been due to the

individual dispatcher relaying incorrect information, not the policy requiring elicitation

and transmission of certain information. The Complaint alleges that Mr. Jordan's

girlfriend "explained [to the dispatcher] that several months prior, Travis talked about

having someone find him a gun but that she had talked him out of it and, thus, he did

not own a gun." [ECF No. 4 at ¶ 22]. The Complaint alleges only that the policy in

question "requires operators to read questions from scripts, and likewise to transmit

that operation to police officers in a scripted information"—not that the policy required

operators to relay materially incorrect information. Therefore, the Complaint does not

plausibly allege that the policy in question caused the deprivation of Mr. Jordan's

rights.

### III. Order

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1. Defendants' Motions for Judgment on the Pleadings [ECF Nos. 13 & 32] are
   **GRANTED** as to all claims against Officer Keyes, The City of Minneapolis,
   and Police Chief Arradondo;

2. Officer Keyes, The City of Minneapolis, and Police Chief Arradondo are
   hereby **DISMISSED**;

3. The Motions are **GRANTED** as to the claim against Officer Walsh regarding
   his initial use of deadly force; and

4. The Motions are **DENIED** as to the claim that Officer Walsh continued to use
   deadly force after a reasonable officer would have realized that deadly force
   violated Mr. Jordan's constitutional rights.

**IT IS SO ORDERED.**

Date: September 21, 2022

  s/Katherine Menendez
Katherine Menendez
United States District Judge